UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

WILLIAM SOURS, Administrator of the
Estate of James Sours,

      Plaintiff,

v.

BIG SANDY REGIONAL JAIL
AUTHORITY, et al.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 11-115-ART

**MEMORANDUM OPINION
AND ORDER**

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On July 13, 2010, James Sours was arrested and booked into the Big Sandy Regional

Detention Center.  R. 52-1.  Two days later Sours was dead.  R. 52-14.  The tragic events that

led to Sours's death are the subject of this case, instituted by plaintiff William Sours as the

administrator of his brother's estate.  The plaintiff believes that the defendants violated

Sours's rights under the Fourteenth Amendment and state law.  The defendants have now

moved for summary judgment.  Their motion is granted in part and denied in part.

## BACKGROUND

When Sours entered the Big Sandy Regional Detention Center, the intake officer sent

him to see Nurse Nancy Allison because Sours was a diabetic.  R. 56-1 at 26–27.  Nurse

Allison was responsible for inmates' medical care when the Detention Center's physician,

Dr. Sarah Belhasen, was not present.  R. 58-2 at 34.  Nurse Allison met with Sours to discuss

his medical history.  She noted that he had liver problems, high blood pressure, and diabetes.

1

R. 51-1 at 1.  His last medical evaluation for his diabetes was at least one month before his arrest.[1]  R. 51-1 at 1; R. 56-1 at 41.  Thus, Nurse Allison concluded that Sours's diabetic condition was not "too bad."  *Id.* at 42–43.  His last doctor had put him on a "sliding scale," meaning that a scale indicates the appropriate insulin dosage for a particular blood sugar level.  *Id.* at 34–35.  But Sours had not taken insulin in over a month, and he told Nurse Allison that he was sometimes confused about when and if he took insulin.  R. 56-1 at 42–43. Sours explicitly told Nurse Allison that he could not care for himself and had no one who could bring insulin to the jail.  R. 52-2 at 1.  Nurse Allison recognized that Sours's blood sugar, which dropped from 283 to 274 during this meeting, was "a little high."  R. 56-1 at 45, 53.  But Nurse Allison attributed Sours's high blood sugar to the influence of drugs or alcohol, which can cause a spike in blood sugar.  R. 56-1 at 44–45, 106.  After meeting with Sours, Nurse Allison faxed her progress notes about Sours to Dr. Belhasen, seeking instructions for Sours's treatment.  R. 51-2.  Nurse Allison then implemented Dr. Belhasen's standing order that diabetics receive a carbohydrate-restricted diet and left instructions for the deputy jailers to monitor Sours's blood sugar.  R. 51-2; R. 56-1 at 29–30.

Sours's blood sugar remained erratic.  At 6:00 a.m. the following day, Sours's blood sugar dropped to 254, only to rise at 2:30 p.m. to 327.  R. 51-3 at 1.  Nurse Allison attributed this blood sugar spike to the fact that Sours was detoxing.   R. 56-1 at 55–56.  At 5:35 p.m., Sours told Deputy Jailers Salyer and Blanton that he did not feel well.  R. 51-4; R. 56-1 at 73–76.  Deputies Blanton and Salyer took Sours to see Nurse Allison.  R. 51-4.  Sours was agitated.  He told Nurse Allison that he wanted to go home, was nauseous, and had vomited.

---

[1] The next day, Nurse Allison contacted two of Sours's former health-care providers.  Both providers told Nurse Allison that they had not seen Sours in over four months.  R. 56-1 at 40–41.

R. 56-1 at 73–76.  But he denied that his blood sugar was acting up.  *Id.*  And Sours did not have the "classical symptoms" of a diabetic episode such as increased thirst, hunger, urination, or headache.  *Id.* at 82–83.  So Nurse Allison concluded that Sours was still detoxing and placed him in a medical observation cell where Sours would be monitored by video and regularly observed in person by deputy jailers.  R. 51-5; R. 56-1 at 76, 142–43.

Nurse Allison did not observe anything unusual before she left that night.  *Id.* at 77, 79.  Before she left, she told the deputy jailers to monitor Sours's blood sugar level, although she noted that there was no insulin in the Detention Center for Sours.  R. 51-7.  Nurse Allison also noted that Dr. Belhasen had ordered blood work and would see Sours the following week.  R. 51-6; R. 51-7.  But Nurse Allison did not send her progress notes to Dr. Belhasen, and she did not tell Dr. Belhasen that Sours's blood sugar had spiked to 327.  R. 56-2 at 8; R. 56-3 at 27–28.  Nurse Allison also met with the jail administrator, Randy Madan.  R. 56-1 at 112.  Madan coordinates all training and supervision for the Big Sandy Regional Jail Authority ("Jail Authority").  R. 58-2 at 70.  Nurse Allison told Madan that Sours was a "critical situation" because he was uncooperative.  R. 56-1 at 112.

Deputy Jailers Jordan, Allen, and Adkins worked from midnight to 8:00 a.m. on July 15, 2010.  R. 57-1 at 24–25, 33.  Deputy Allen was the senior officer and supervisor on duty.  R 52-9 at 1.  The previous shift informed the deputy jailers that Sours was a diabetic in observation who was irritable and had vomited.  R. 57-2 at 25; R. 57-3 at 26–28.  At approximately 3:15 a.m., Sours complained to deputies Allen and Adkins that he was having chest pains.  R. 57-2 at 30. Deputy Allen asked Deputy Jordan (who was monitoring Sours via video, R. 58-1 at 10) to watch Sours closely on video monitors in the control room.

3

R. 51-10.  Six minutes later, Deputy Jordan observed Sours trying to make himself throw up.
R. 51-11.  Then, at 6:17 a.m., Deputy Adkins went to Sours's observation cell to escort him
to the medical wing so that staff could test his blood sugar.  R. 51-12; R. 57-2 at 19–20.
Sours refused to take his blood sugar.  R. 51-12.  But he did complain of chest pain and said
that his blood pressure was "out of control."  R. 51-12; R. 57-1 at 47; R. 57-2 at 48–49.

Deputy Jailer Paul Griffith worked from 8:00 a.m. to 4:00 p.m. on July 15, 2010.
R. 57-4 at 11.  Sours refused Deputy Griffith's repeated offers of medication and refused
another deputy jailer's attempts to take his blood sugar.  R. 51-13; R. 51-14; R. 57-4 at 11.
Sours later refused Deputy Montgomery's attempts to bring Sours to the nurses' station to
have his blood sugar taken.  R. 51-3; R. 58-3 at 11–12.  Jail guards believed that everything
was "ok" until 10:15 p.m., when Deputy Blanton observed Sours attempting to make himself
throw up.  R. 51-17; R. 57-3 at 29.  Then, at 10:45 p.m., Deputy Salyer found Sours awake
and breathing but unresponsive.  R. 51-21; R. 51-22; R. 57-3 at 34–35.  Deputy Salyer
summoned deputies Blanton and Montgomery, who arrived seven minutes later.  R. 57-3 at
53.  Deputy Montgomery called an ambulance six minutes after he arrived at the cell.  R. 51-
23; R. 58-3 at 42, 46.  The ambulance arrived several minutes later, but Sours stopped
breathing "just seconds before" emergency personnel entered his cell.  R. 51-21; R. 52-12; R.
58-3 at 48. The medical personnel took Sours to the local hospital, where he died of diabetic
ketoacidosis.  R. 52-12; R. 52-14.

The plaintiff sued under 42 U.S.C. § 1983, alleging that the defendants violated
Sours's Fourteenth Amendment rights.  The plaintiff also believes the defendants are liable

4

for negligence, gross negligence, and violations of 501 Ky. Admin. Regs. § 3:090. *See* R. 25. The defendants now move for summary judgment. R. 51.

## ANALYSIS

As the moving party, the defendants must demonstrate that undisputed evidence forecloses a claim or identify an element of a claim that Sours cannot support with admissible evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). If they do so, Sours must respond with "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). The Court then decides whether a reasonable juror could find for Sours on each of his claims when all reasonable inferences are drawn in his favor. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Sours's constitutional claims fail this standard, as does his claim under Kentucky's Administrative Regulations and his negligence claims against the Jail Authority, Administrator Madan, and Deputies Allen, Blanton, Montgomery, Salyer, and Griffith. However, his negligence claims against Nurse Allison survive.

## I.    Section 1983 Claim for Violations of Sours's Constitutional Rights

The plaintiff believes that the defendants violated his brother's Fourteenth Amendment right to adequate medical treatment. *See Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010) ("The Eighth Amendment forbids prison officials from . . . acting with deliberate indifference toward [an inmate's] serious medical needs. . . . [A] pretrial detainee[] is analogously protected under the Due Process Clause of the Fourteenth Amendment." (internal quotations omitted)). Constitutional claims based on the adequacy of an inmate's medical treatment turn on whether the defendant was deliberately indifferent to

5

the inmate's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). Deliberate indifference is the "reckless[] disregard" of a "substantial risk of serious harm to a prisoner." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Thus, a deliberate indifference claim has two components. First, the objective component requires a plaintiff to show "that the medical need at issue [wa]s sufficiently serious." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quotation omitted). Second, the subjective component requires proof that the defendant was actually aware of the plaintiff's serious medical needs and chose to disregard that risk. *Id.* at 703. None of the plaintiff's constitutional claims meet this high bar.

### A.    Nurse Nancy Allison is Entitled to Summary Judgment

Nurse Allison rightly concedes the objective component of the deliberate indifference test. R. 51 at 7. Sours was a diagnosed diabetic. R. 52-14. Diabetes is a serious medical condition that satisfies the objective prong of the deliberate indifference test. *See, e.g.*, *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005) (finding diabetes that "required insulin injections at regular intervals" a serious medical condition). The plaintiff's deliberate indifference claim fails on the subjective component of the deliberate indifference test.

Sours believes that the following facts show Nurse Allison's knowledge of the seriousness of Sours's condition. Nurse Allison knew that Sours was diabetic. She knew that his other conditions (like liver disease) *could* exacerbate his diabetes, R. 56-1 at 39, that he couldn't care for himself,  R. 52-2 at 1, that his blood sugar was fluctuating, and that he was nauseous. R. 56-1 at 73–76. All in all, Sours was "clearly a sick man," R. 56-3 at 32, and

6

Nurse Allison knew he was in a "critical situation[]." R. 56-1 at 112. And Nurse Allison moved Sours to a medical cell, indicating that she believed his condition should be monitored. *Id.* at 75–76.

But none of these facts without further speculation creates a material issue as to Nurse Allison's knowledge about Sours's risk for diabetic ketoacidosis, or indicate that she recklessly disregarded her knowledge about Sours's diabetic condition. Nurse Allison stated that she believed Sours was detoxing, and that this condition explained his blood sugar spikes and his nausea. *See, e.g.*, R. 56-1 at 55. And while Nurse Allison's assumption turned out to be incorrect, deliberate indifference requires a prison official to have actual knowledge of an inmate's risks. *Farmer*, 511 U.S. at 837. Negligence in diagnosing a medical condition is not deliberate indifference. *Jones*, 625 F.3d at 945. So Nurse Allison's failure to properly diagnose diabetic ketoacidosis or provide treatment for this condition cannot constitute deliberate indifference.

The plaintiff, however, points to further failures. He believes Nurse Allison exhibited deliberate indifference when she did not order insulin (despite Sours's high blood sugar) and failed to call Dr. Belhasen or leave thorough instructions for the deputy jailers. R. 52 at 18. The plaintiff may be correct that Nurse Allison should have done those things. But her treatment of Sours was not "so cursory as to amount to no treatment at all." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002) (quotation omitted). Nurse Allison conducted an initial interview with Sours and concluded that his diabetes was not serious, that he was surviving without insulin, and that his blood sugar spikes were due to detoxing. R. 52-2; R. 56-1 at 42–45. She instituted Dr. Belhasen's standing order for

7

diabetics, ordered blood work for later in the week and scheduled Sours to see Dr. Belhasen the following week. R. 56-1 at 29–30, 56–57. Nurse Allison also ordered that Sours's blood sugar be taken before meals and during her shift convinced Sours to test his blood sugar. *Id.* at 50–54. When Sours continued to feel ill, Nurse Allison placed him in a medical cell so he could be constantly observed. *Id.* at 73–76. Finally, she left instructions for guards to monitor Sours and take his blood sugar, apparently assuming that guards would call her if Sours refused to take his blood sugar. R. 51-7; R. 56-1 at 88. Where, as here, a prisoner received medical attention for his serious needs, courts are "generally reluctant" to wade into disputes over the adequacy of treatment. *Graham ex rel. Estate of Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).

This is not a case where Nurse Allison ignored Sours's symptoms for several weeks, or where Sours explicitly informed the defendants that he needed insulin. *See, e.g.*, *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 541 (6th Cir. 2008) (finding deliberate indifference where the decedent "exhibited life-threatening symptoms over a two-week period" but "the correctional officers' fail[ed] to transport her to a hospital" and the jail doctor failed to follow-up on tests during this period); *Garretson*, 407 F.3d at 798 (finding deliberate indifference where the plaintiff "informed [the defendant] at her booking that she required insulin for her condition *and that she was past due for her current dose*" (emphasis added)). Nurse Allison made several false assumptions in her treatment of Sours, and these assumptions ended in tragedy. But she attempted to treat his medical needs. So she was not deliberately indifferent.

**B.     Deputy Jailer Allen is Entitled to Summary Judgment**[2]

Defendant Tony Allen was the supervisor on duty the morning of July 15, 2010. R. 57-2 at 24.  Like Nurse Allison, Deputy Allen concedes the objective component of the deliberate indifference test, so the dispute is over Deputy Allen's subjective perceptions. The plaintiff believes that Deputy Allen "could have perceived a substantial risk of serious harm to [Sours]." *Clark-Murphy*, 439 F.3d at 290.  Specifically, the plaintiff argues that Deputy Allen knew Sours was in observation, had vomited and was trying to throw up, was irritable, and was having chest pains.  R. 57-2 at 25, 30; R. 57-3 at 26–28.  And Deputy Allen knew that Sours refused to take his blood sugar and said that his blood pressure was "out of control."  R. 51-12; R. 57-1 at 47; R. 57-2 at 48–49.

None of these facts imply that Deputy Allen had knowledge of Sours's serious medical risk of insulin deprivation.  Deputy Allen was "under the impression" that Sours was detoxing.  R. 57-2 at 46–48.  And Deputy Allen was entitled to rely on Nurse Allison's medical judgments that Sours was detoxing, rather than experiencing a different and more serious medical complication.  *See Hamilton v. Pike Cnty., Ky.*, No. 11-cv-99-ART, 2013 WL 529936, at *7 (E.D. Ky. Feb. 11, 2013) (collecting cases).  Sours refused to take his blood sugar, so there was no way Deputy Allen could have known that his blood sugar was unusually high.  52-9; R. 57-2 at 49.  And it is no surprise that Sours's refusal did not trigger any alarm bells for Deputy Allen–after all, it was not uncommon for Detention Center inmates to refuse blood sugar tests.  R. 57-2 at 15.  And Deputy Allen was unaware that Sours's chest pain and his attempts to make himself vomit indicated an ongoing medical

---

[2] The plaintiff has no objection to the dismissal of his claims against defendants Adkins and Jordan.  R. 52 at 19 n.4.

9

emergency.  R. 57-2 at 17–18, 34–35.  In fact, he kept watch on Sours's condition and "couldn't tell any difference" in Sours's condition over much of the shift.  R. 57-2 at 49–51.  And he was prepared to call someone if Sours's condition appeared to worsen.  R. 57-2 at 50.  So, Deputy Allen was not deliberately indifferent.

## C.    Deputy Jailer Paul Griffith is Entitled to Summary Judgment

Deputy Jailer Paul Griffith worked from 8:00 a.m. to 4:00 p.m. on July 15, 2010.  R. 57-4 at 11.  Like the other defendants, Griffith agrees that Sours's medical needs were objectively serious but argues that the plaintiff cannot demonstrate subjective awareness of these needs.  The plaintiff argues that knowledge can be inferred from the following facts: (1) Griffith knew Sours was diabetic.  (2) Sours refused Griffith's repeated offers of medication.  R. 51-14 at 1; R. 57-4 at 11.  (3) Griffith knew the importance of diabetics taking their medication.  R. 57-4 at 22.  (4) Griffith did not inform medical staff that Sours did not take his medication, even though he would have done so had the medical staff been present at the jail.  *Id.* at 30.

However, it appears that the medication that Sours refused was unrelated to his diabetes.  The defendants state that the medication was for irritable bowel syndrome and nausea.  R. 51 at 15.  Deputy Griffith's incident report, however, simply indicates that Sours refused unspecified medications.  R. 51-13; R. 51-14.  But the plaintiff does not argue that the medication *was* for Sours's diabetes.  R. 52 at 24.  In fact, one of the plaintiff's complaints is that the Jail did not have insulin for Sours.  R. 52 at 15.  And the fact that Sours refused medication for conditions that were not clearly related to his diabetes does not demonstrate that Deputy Griffith was aware of Sours's risk for diabetic complications.

10

Instead, it appears that Deputy Griffith, like Deputy Allen, simply followed Nurse Allison's instructions to observe Sours and attempt to take Sours's blood sugar. And, like Deputy Allen, Deputy Griffith did not believe Sours was experiencing a medical emergency. R. 57-4 at 15. Sours's symptoms were consistent with the typical symptoms of a detoxing inmate, so this belief was not unreasonable. R. 57-1 at 55–56. Perhaps Deputy Griffith should have realized that the situation was dire. But deliberate indifference requires actual knowledge, and so Deputy Griffith is entitled to summary judgment on this claim. *See Reilly*, 680 F.3d at 624.

## D.   Deputy Jailers Montgomery, Blanton, and Salyer are Entitled to Summary Judgment

Deputy Jailers Montgomery, Blanton, and Salyer worked between 4:00 p.m. and midnight on July 14 and 15, 2010. Like the other defendants, Deputies Montogomery, Blanton, and Salyer agree that Sours's condition was objectively serious. So the only disputed issue is whether these defendants "recklessly disregard[ed]" a "substantial risk of serious harm" to Sours. *Farmer*, 511 U.S. at 836. They did not. The evidence demonstrates that Deputy Montgomery, the shift supervisor, knew that Sours was diabetic and believed that he was detoxing. R. 58-3 at 21, 14–16. Deputy Montgomery tried to take Sours's blood sugar at 7:15 p.m. on July 15, 2010, but Sours refused. *Id.* at 17. At 10:15 p.m. Deputy Blanton observed Sours attempting to make himself throw up. R. 51-17; R. 57-3 at 29. Shortly thereafter, Deputy Salyer found Sours awake and breathing but unresponsive. R. 51-21; R. 51-22; R. 57-3 at 34–35. Deputy Salyer then summoned Deputies Blanton and

11

Montgomery, who quickly arrived at Sours's cell.  R. 57-3 at 53.  Deputy Montgomery called an ambulance shortly thereafter.  R. 51-23; R. 58-3 at 42, 46.

The plaintiff believes these actions demonstrate deliberate indifference. First, he believes that Deputy Montgomery should have contacted a medical professional when Sours refused to take his blood sugar.  Second, he believes that Deputies Blanton and Montgomery should have realized the seriousness of Sours's condition when Sours tried to make himself throw up.  R. 52 at 27. Third, the plaintiff faults the defendants for their responses to finding Sours unresponsive.  He believes Deputy Salyer exhibited deliberate indifference for calling Deputies Blanton and Montgomery to Sours's cell instead of immediately calling an ambulance.  R. 52 at 25.  He faults all the defendants for waiting six minutes to call an ambulance after Deputies Montgomery and Blanton arrived at the cell.   *Id.* at 29.  And he believes that all the defendants should have administered first aid, *id.* at 26, 29, and driven Sours to the hospital instead of waiting for an ambulance.  *Id.* at 29.

None of these facts demonstrate deliberate indifference.  Like Deputies Allen and Griffith, Deputies Montgomery and Blanton did not believe that Sours's refusal of a blood sugar test or his attempts to make himself throw up indicated a medical emergency.  R. 57-2 at 30–33; R. 58-3 at 14–15, 18.  And there are undisputed explanations for the delay between Deputy Salyer's discovery that Sours was unresponsive and his transport to the local hospital.  When Deputy Salyer first discovered that Sours was unresponsive, he was still awake and breathing.  R. 51-21; R. 58-3 at 38.  Deputy Salyer was apparently unsure how to proceed, so he contacted Deputies Blanton and Montgomery.  R 57-3 at 53.  Both deputies came as fast as they could.  R. 57-3 at 53; R. 58-3 at 30.  After arriving at Sours's cell, the

12

deputies tried "touching [Sours] on the arm, [] to get him to talk" and "asked him if he was all right and tried to get him to talk back." R. 58-3 at 44. When it was clear that Sours was having a medical emergency, *id.*, Deputies Montgomery and Blanton conferred about the best way to transport Sours to the hospital. R. 57-3 at 52. Deputy Montgomery decided to call an ambulance because he believed it would be the quickest way to transport Sours to the hospital. R. 58-3 at 33–36. And, while the plaintiff believes that the deputies should have administered first aid to Sours, he does not specify what actions he believes the deputies should have taken.

The constitutionality of a delay in medical treatment turns, in part, on the reason for the delay. *Cf. Scicluna v. Wells*, 345 F.3d 441, 446 (6th Cir. 2003) ("In the absence of an explanation for the delay, however, a reasonable inference [of deliberate indifference] arises."); *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) ("[T]he reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable."). The plaintiff points to cases where there is an *unexplained* delay in the face of a clear medical emergency. R. 52 at 30. Those cases held that an officer's decision to attend to other tasks can be so reckless as to amount to deliberate indifference. Those cases do not control here. Every action that the deputy jailers took after finding Sours unresponsive was focused on Sours's well-being. Deputy Salyer delayed only to get second opinion from the other deputy jailers. The deputy jailers then examined Sours to determine whether he was having a medical emergency. The deputies then consulted about how to transport Sours to the hospital. They determined that an ambulance would be

most efficient.  None of these decisions indicate deliberate indifference to Sours's serious medical needs.

**E.      Randy Madan is Entitled to Summary Judgment**

Randy Mandan was the Detention Center's administrator.  R. 58-2 at 11.  Madan had no personal interaction with Sours.  R. 58-2 at 79–80.  On July 14, 2010, Madan and Nurse Allison had a conversation in which Nurse Allison described Sours as a "critical situation" because Sours was irritable and was not cooperating with efforts to take his blood sugar. R. 56-1 at 112.  The plaintiff argues that Madan was therefore aware that Sours was at serious medical risk and that "[g]iven Defendant Madan's statutory, regulatory and policy responsibilities . . . he must share with Defendant Allison liability for what followed . . . ." R. 52 at 31.  But, as noted above, non-medical prison officials are not deliberately indifferent when they rely on the judgment of the prison medical staff.  *See, e.g.*, *Ronayne*, 173 F.3d 856, at *3 (6th Cir. 1999) (unpublished table decision) ("Supervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care."). Here, Madan relied on Nurse Allison's medical judgments.  R. 58-2 at 33–35, 51–52.  And Kentucky regulations specifically prohibit jailers from "restrict[ing]" the health care staff's performance of their duties.  501 Ky. Admin. Regs. § 3:090(1)(3).  So Madan was not deliberately indifferent to Sours's serious medical needs.

Like the rest of the individual defendants, Madan is entitled to summary judgment on the plaintiff's deliberate indifference claims.  Thus, the Court need not decide whether any of these defendants is entitled to qualified immunity on this claim.

14

**F.     The Jail Authority and Randy Madan in his Official Capacity Are Entitled to Summary Judgment**

The plaintiff believes that the Jail Authority is liable for violations of his Fourteenth Amendment rights.  R. 52 at 31.[3]  The Jail Authority was created by several Kentucky counties.  *See* Ky. Rev. Stat. § 441.800.  So the Jail Authority cannot be sued under section 1983 because municipal departments—such as jails—are not "persons" subject to suit under the statute.  *See Rhodes v. McDannel*, 945 F.2d 117, 120 (6th Cir. 1991).  Accordingly, the Court construes the plaintiff's suit as against Johnson, Lawrence, Magoffin, and Martin Counties.  *See Bush v. Carter County Det. Ctr.*, No. CIV.A. 10-16-DLB-EBA, 2011 WL 3880468, at *1 n.1 (E.D. Ky. Aug. 29, 2011) ("Accordingly, the Court construes the claims against Carter County Detention Center as against Carter County itself.").

Counties are liable under section 1983 if a constitutional violation results from an official policy or custom of that county.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  The plaintiff believes that the Jail Authority failed to train its employees "and/or to promulgate appropriate operating policies and procedures . . . ."  R. 25 at 3; R. 52 at 35–36.  Madan had sole responsibility to coordinate health care and emergency response training at the Detention Center.  R. 52 at 31; R. 56-1 at 101 (Nurse Allison's statement that she had no authority to conduct this training).  But, the plaintiff argues, jail officers were not trained to identify or respond to medical emergencies.  R. 52 at 31–37.

But even if the Jail Authority's training was inadequate, it cannot be held liable without an underlying constitutional violation by the individual defendants.  *See Watkins v.*

---

[3] The plaintiff's official-capacity suit against Madan is redundant with his suit against the Jail Authority.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.").

*City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001).   Thus, the official-capacity defendants are entitled to summary judgment.

## II.     State Law Claims for Negligence and Gross Negligence

The plaintiff also brings state-law tort claims against the defendants for negligence and gross negligence in their treatment of Sours.  R. 25 at 8.  The defendants believe they are immune from liability on these claims.  The individual defendants also argue that they were not negligent.  R. 51 at 27.  The defendants are right in part.  The Jail Authority is entitled to sovereign immunity, and both Administrator Madan and the deputy jailers are entitled to qualified official immunity.  But Nurse Allison is not entitled to immunity, and there is a genuine issue of material fact as to Nurse Allison's negligence.

## A.     The Jail Authority is Entitled to Sovereign Immunity

Counties in Kentucky are "cloaked with sovereign immunity."  *Lexington-Fayette Urban Cnty. Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004).  Kentucky has not waived its immunity against tort suits or suits for violations of administrative regulations.  So the Jail Authority has sovereign immunity for claims of negligent operation of the Detention Center. *Commonwealth v. Harris*, 59 S.W.3d 896, 899 (Ky. 2001).  Therefore, summary judgment in favor of the Jail Authority on the plaintiff's negligence claims is appropriate.

## B.     Qualified Official Immunity

Public officials in Kentucky enjoy qualified official immunity, "which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).  There are three elements to the affirmative defense of qualified official immunity.  The official must have been (1)

16

performing a discretionary act or function (2) within the scope of his authority and (3) in good faith. *See id.* If an official establishes the first two elements, then the plaintiff has the burden to disprove the third. *See id.* at 523. The plaintiff does not argue that the defendants' actions were outside the scope of their authority or that they acted in bad faith. R. 52 at 37. Thus, the defendants' immunity turns on whether their acts were discretionary or ministerial.

A discretionary act is one that involves "the exercise of discretion and judgment, or personal deliberation, decision, and judgment." *Yanero*, 65 S.W.3d at 522; *see also Turner v. Nelson*, 342 S.W.3d 866, 875–76 (Ky. 2011) (holding that a teacher's acts in carrying out her duty to prevent foreseeable harm to her students were discretionary); *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 480 (Ky. 2006) (holding that a prison official's job of supervising a prison work crew was "as discretionary a task as one could envision"). An act is discretionary where it "may be performed in one [of] two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed." *Upchurch v. Clinton Cnty.*, 330 S.W.2d 428, 430 (Ky. 1959) (citation omitted). In contrast, a ministerial act "requires only obedience to the orders of others" or involves a duty that "is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero*, 65 S.W.3d at 522 (holding that enforcement of a rule requiring that students wear helmets during batting practice was a ministerial act).

Despite these general guidelines, a regulation or statute will often task officials with both ministerial and discretionary functions. *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010) ("[F]ew acts are ever purely discretionary or purely ministerial.") Take, for example,

17

an official investigation into allegations of child abuse. Such an investigation will involve both ministerial tasks, such as the mandatory interview of particular individuals, and the discretionary decision of whether and how to pursue the allegations. *See, e.g.*, *Stratton v. Commonwealth,* 182 S.W.3d 516, 521 (Ky. 2006); *see also Carl v. Dixon*, 2010-CA-000676-MR, 2011 WL 919896, at *3 (Ky. Ct. App. Mar. 18, 2011) (duty to create an inmate classification is ministerial, but an officer's decisions on how to enforce the inmate classification system is discretionary). Consequently, the determination of whether a particular act is discretionary or ministerial focuses on the "*dominant* nature of the act." *Haney,* 311 S.W.3d at 240.

In Kentucky, it is generally true that "[t]he administration of medical care is a ministerial function" such that "[c]ompliance with the applicable standard of care does not involve a discretionary governmental function." *Gould v. O'Bannon,* 770 S.W.2d 220, 222 (Ky. 1989) (three doctors were members of anesthesiology team and were allegedly negligent in regard to the insertion of a needle for a catheter which cut the plaintiff's artery). However, this general rule has exceptions where the provision of medical care primarily involves the exercise of an official's judgment. In this situation, jail officials are required to make the sort of "good faith judgment calls [] in a legally uncertain environment" that Kentucky's qualified official immunity doctrine were designed to protect. *Yanero*, 65 S.W.3d at 522; *see also Caneyville Volunteer Fire Dep't*, 286 S.W.3d 790, 809 n.9 (Ky. 2009) (finding that the exercise of professional judgment is more likely to be a discretionary act).

The classification of an act as ministerial or discretionary is further complicated when a ministerial policy is dependant on a factual precondition.  Sometimes, the determination of whether the factual precondition is present is a discretionary act.  For example, the discretionary determination that an inmate is suicidal may trigger ministerial duties related to the inmate's care.  *Jerauld ex rel. Robinson v. Kroger*, 353 S.W.3d 636, 641–42 (Ky. Ct. App. 2011).  But not all factual determinations are discretionary acts.  *Upchurch,* 330 S.W.2d at 430 ("[T]hat a necessity may exist for the ascertainment of . . . facts does not operate to convert the act into one discretionary in its nature." (quotation omitted)).  In the end, the determination of whether a factual precondition requires a separate discretionary judgment or is part and parcel of the ministerial act depends on the particularity of the official's investigative responsibilities.  *See Leonhardt v. Simmons*, 2011-CA-001208-MR, 2012 WL 3538464, at *9 (Ky. Ct. App. Aug. 17, 2012) ("[I]n any event, portions of investigative responsibilities as set out in policies and regulations, which are particular in their directive . . . are nevertheless ministerial.").

If an official's investigative responsibilities are particular and stem from fixed and designated facts, then they are part and parcel of the ministerial duty triggered by the factual precondition.  For example, compliance with a protocol requiring "nurses to contact a physician if [an] inmate's symptoms persist[] for more than 24 hours" is a ministerial act.  It requires no exercise of judgment to determine that an inmate's symptoms have lasted a full day.  *See Osborne v. Aull*, No. 2010-ca-1073-mr, 2012 WL 3538276, at *6 (Ky. Ct. App. Aug. 17, 2012).  Similarly, an official with training to recognize the symptoms of intoxication and withdrawal has a ministerial duty to identify these conditions and comply

19

with the attendant regulations.  *See Leonhardt*, 2012 WL 3538464, at *9.  And jailers act in their ministerial capacities when they follow policies forbidding the admission of arrestees who are unconscious or have a blood alcohol content greater than .30 percent.  *Coleman v. Smith*, 2011-CA-001276-MR, 2012 WL 4210031, at *5 (Ky. Ct. App. Sept. 21, 2012).

Other factual determinations require discretionary judgment calls, and are protected by qualified official immunity.   For example, the evaluation of whether an individual is a suicide risk involves professional judgment and is a discretionary act.  *Jerauld*, 353 S.W.3d at 641–42.   Jailers also exercise discretion when they determine "whether the arrestee presents discernable indicators of serious illness, injury, or drug overdose as distinguished from inebriation caused by the intemperate consumption of alcohol or drugs."  *Coleman*, 2012 WL 4210031, at *5; *see also Finn v. Warren Cnty., Ky.*, 1:10-CV-00016-JHM, 2012 WL 3066586, at *26 (W.D. Ky. July 27, 2012) (holding that the determination whether an inmate is deteriorating requires "the exercise of professional expertise and judgment" that qualified official immunity was created to protect," but finding that "the requirements to record assessments and notify deputy jailers about [] detoxification are . . . ministerial" (quotations omitted)).  Once such a factual determination is made, it may trigger ministerial duties, such as notifying medical personnel or transporting the inmate to the hospital.  But the initial factual determination requires the exercise of judgment and is protected by qualified official immunity.

Thus, when evaluating an inmate's claim that his medical care was negligent, the Court must answer the following questions: (1) What was the alleged negligent act;  (2) Was the act discretionary or ministerial; (3) if the act was ministerial, was it triggered by "fixed

and designated" facts or an exercise an official's professional judgment; (4) if the ministerial duty is triggered by a discretionary judgment, is there evidence indicating that the official's factual judgment triggered the ministerial duty for which he does not have immunity?

## A.      Nurse Allison is Entitled to Partial Immunity

The plaintiff points to several acts which he believes demonstrate Nurse Allison's negligence.  First, he faults Nurse Allison for failing to order insulin, despite her knowledge that Sours was a sliding-scale diabetic.  R. 52 at 13.  Second, he believes that Nurse Allison should have informed Dr. Belhasen about Sours's symptoms and blood sugar reading on July 14, 2010.  *Id.* at 13–14.  Third, the plaintiff argues that Allison should have been aware of Sours's risk for diabetic ketoacidosis on July 14, *id.* at 18.  Fourth, the plaintiff contends that Allison failed to leave adequate instructions for the deputy jailers.  *Id.* at 18.[4]  Only the last act supports a viable claim against Nurse Allison.

*Failure to Order Insulin*:  Nurse Allison was required to provide Sours with adequate medical care.  *See* Ky. Rev. Stat. § 71.040 (The jailer shall treat [inmates] humanely . . . .");  501 Ky. Admin. Regs. § 3:140 (requiring access to necessary medical care).   These requirements trigger ministerial and discretionary duties.  If an inmate requires a particular medication (such as insulin), it "is absolute, certain, and imperative" that the inmate receive that medication.  *Yanero*, 65 S.W.3d at 522.  It does not require any discretionary judgment to order a medication that the official knows is necessary.  But, the diagnosis that an inmate needs a particular medication may require the discretionary exercise of professional

---

[4] The plaintiff also faults the Nurse Allison for leaving Sours in a position where he would be required to test his own blood sugar and administer his own insulin.  But since Sours refused most blood sugar tests and never administered his own insulin, it is not clear how the Jail Procedure 2(f), which prohibits inmates from "perform[ing] any medical functions within the jail," demonstrates that any defendant was negligent with respect to Sours's care.  R. 52-16 at 2.

judgment. *Jerauld*, 353 S.W.3d at 641–42. And, in Nurse Allison's professional judgment, Sours did not need insulin "right away." R. 56-1 at 69. So even if the plaintiff could prove that Nurse Allison's failure to order insulin caused his injury, qualified official immunity would protect Nurse Allison from liability for this decision.

*Failure to Contact Dr. Belhasen*: The plaintiff believes that when Nurse Allison saw that Sours's blood sugar tested at 327, she should have contacted Dr. Belhasen or sent Sours to the hospital. R. 52 at 14. But, when faced with Sours's high blood sugar, Nurse Allison did not have a mandatory course of action. As Dr. Belhasen explained, Nurse Allison could have called her, taken Sours to the hospital, or done nothing. R. 56-3 at 48–49. Nurse Allison may have chosen poorly here. As noted above, Nurse Allison's professional judgment led her to believe that Sours was detoxing and that there was little cause for alarm. R. 56-1 at 44–45, 106. But her choice was part of a "qualitative assessment" that relied on her professional judgment. *See, e.g.*, *Coleman*, 2012 WL 4210031, at *5. Thus, Nurse Allison is entitled to qualified official immunity for this act.

*Failure to Diagnose*: Nurse Allison's determination that Sours's blood sugar spikes were due to detoxing was incorrect. But it was also discretionary. Diagnosing a patient requires the subjective interpretation of the patient's symptoms and the exercise of professional judgment. *Coleman*, 2012 WL 4210031, at *5. These are classic features of discretionary acts. *Haney*, 311 S.W.3d at 243 (emphasizing that a discretionary act is "largely subjective and left to the will or judgment of the performer" (internal quotation marks omitted)). Thus, Nurse Allison is entitled to qualified immunity for this decision.

*Failure to Leave Instructions*: Nurse Allison conceded that "the standard of care of a registered nurse" required her to make sure that the deputy jailers had "the education, experience, training" necessary to care for Sours in her absence. R. 56-1 at 101–02. There is a material question of fact as to whether she complied with this standard of care. Nurse Allison admitted that the deputy jailers probably could not identify the symptoms of diabetic ketoacidosis, that she did not write these symptoms down, and that there was no information in the Detention Center about diabetes. *Id.* at 97–98, 114. And Nurse Allison is not entitled to qualified official immunity for her actions. Her duty to ensure that Sours could be cared for in her absence was mandatory and ministerial, even if her decision *how* to do so was discretionary. *See, e.g.*, *Carl*, 2011 WL 919896, at *3. Nurse Allison's decision to leave a note to the guards to check Sours's blood sugar does not change this analysis. This does not demonstrate compliance with Nurse Allison's duty to leave Sours in the care of someone with "the education, experience, training" necessary to care for him. Thus, Nurse Allison is not entitled to qualified official immunity for this act.

**B.      Randy Madan is Entitled to Immunity**

The plaintiff faults Madan for his failure to realize that Sours was at risk during his conversation with Nurse Allison. The plaintiff argues that "[g]iven Defendant Madan's statutory, regulatory and policy responsibilities . . . he must share with Defendant Allison liability for what followed . . . ." R. 52 at 31. It is unclear what acts Sours believes demonstrate Madan's negligence. While the plaintiff charges Madan with his failure to train the deputy jailers, it appears that these claims are brought against Madan in his official capacity only. R. 52 at 31. And it is not the Court's role to make the plaintiff's arguments.

23

*See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (internal quotation and ellipses omitted)).  So the Court must agree with the defendant that the plaintiff has not demonstrated a genuine issue of material fact for trial on this claim.

## C.       The Deputy Jailers Are Entitled to Qualified Official Immunity

The plaintiff faults the deputy jailers for two types of action.  First, the plaintiff believes that the deputy jailers were negligent when they did not realize that Sours's situation was dire because Sours refused his blood sugar tests, said that his chest hurt, and tried to make himself throw up.  Second, that Deputies Blanton, Montgomery, and Salyer were negligent in responding when they found Sours unresponsive in his cell.  The deputy jailers are entitled to immunity on each claim.

*Negligent Treatment*: The plaintiff has not pointed to a specific policy or regulation requiring the deputy jailers to contact Nurse Allison or Dr. Belhasen if Sours refused a blood sugar test.  It appears that the plaintiff believes that the deputy jailers should have realized that Sours's refusal of these tests put him at serious medical risk, triggering regulations related to emergency care.  R. 52 at 8–10.  Similarly, the plaintiff faults these defendants for failing to realize that Sours was having a medical emergency when he said that his chest hurt and when they saw Sours try to make himself throw up.  But the determination of whether an inmate is having a medical emergency is discretionary.  *See Finn*, 2012 WL 3066586, at *24 (holding that the determination whether an inmate is deteriorating requires "the exercise of professional expertise and judgment"); *Coleman v. Smith*, No. 2011-CA-001276-MR, 2012

24

WL 4210031 (Ky. Ct. App. Sept. 21, 2012).  This is not a case where the defendants failed in their ministerial obligations to observe Sours for an "objective factual question," such as whether he was conscious or unconscious.  *See Hedgepath v. Pelphrey*, No. 12-5314, 2013 WL 1395893, at *6 (6th Cir. Apr. 5, 2013).  The deputy jailers made a subjective determination that Sours's symptoms did not qualify as an emergency.  This determination requires the sort of good faith judgment call protected by qualified official immunity. *Yanero*, 65 S.W.3d at 522.  And regulations that classify detoxing as a medical emergency do not change the Court's analysis.  *See* R. 52 at 10.  Nurse Allison originally diagnosed Sours as detoxing, so it would make little sense for the deputy jailers to contact her based on the medical emergency for which she had already prescribed a course of action.

*Emergency Response*: The plaintiff also faults the deputy jailers for their response after finding Sours unresponsive.  Sours appears to argue that the deputies individual decisions–for example, Deputy Salyer's decision to get a second opinion from his fellow deputies, or Deputy Montgomery's decision to call an ambulance–were negligent.  It is not clear that this is so, because Sours has failed to present admissible evidence to demonstrate that either deputy should have realized the other course was correct or that Sours was harmed by either decision.

In any case, the defendants are entitled to qualified official immunity because they did not violate any ministerial duty in responding to Sours's medical emergency.  Deputy Salyer called Deputies Blanton and Montgomery as part of his discretionary determination that Sours was experiencing a medical emergency.  *See Finn*, 2012 WL 3066586, at *24.  As soon as it was clear that Sours was completely unresponsive, the deputies complied with

regulations requiring the provision of emergency care.  Deputies Blanton and Montgomery briefly conferred about how best to transport Sours to the hospital.  R. 57-3 at 52.  Deputy Montgomery decided to call an ambulance, which presumably arrived as soon as possible. R. 58-3 at 33–36.  So the defendants complied with their ministerial duty to provide care in a medical emergency.  *See* 501 Ky. Admin Regs § 3:090; 501 Ky. Admin. Regs. § 3:140; Jail Policy 47, R. 52-16.  The plaintiff clearly believes that the deputies should have responded differently, for example, by taking Sours to the hospital in the Detention Center's vehicle instead of conferring and calling an ambulance.  But the deputies are entitled to qualified official immunity on their decisions about *how* to follow the regulations governing emergency care.  While the provision of emergency care is ministerial, the deputies retained "significant discretion" in their provision of this care.  *See Carl*, 2011 WL 919896, at *3 ("Since Carl retains significant discretion in the manner in which to enforce the system, a claim based on his failure to enforce the prisoner classification system implicates discretionary functions.").  So the deputy jailers are entitled to qualified official immunity for their response.

### III.    Administrative Claim Under 501 Ky. Admin Regs. § 3:090

The defendants are also entitled to summary judgment on the plaintiff's administrative claim under 501 Ky. Admin. Regs. § 3:090.  The defendants argue that section 3:090 does not provide a private right of action, and, in any case, that they did not violate the regulation.  R. 51 at 33.  As an initial matter, the defendants are probably correct that the regulation does not provide a private right of action.  As one court recently noted, "the viability of a claim for violations of 501 KAR Chapter 3 is questionable" without an enabling

26

statute that specifically provides that a violation of the regulation is a violation of the enabling statute. *See Johnson v. Prison Health Servs., Inc.*, No. 3:06-cv-516-H, 2009 WL 3856188, at *2 (W.D. Ky. Nov. 17, 2009) (citing *Hargis v. Baize,* 168 S.W.3d 36 (Ky. 2005), which held that the violation of an administrative regulation "is actionable . . . if the right of action arises from a source" separate from the regulation, and finding the enabling statute a separate source).

But the Court need not decide whether the regulation creates a private right of action. The individual defendants also argued that they are not subject to this regulation, and the Jail Authority argued that there is no evidence that it violated section 3:090. R. 51 at 33. While the plaintiff makes a half-hearted attempt to argue that the regulation provides a private right of action, R. 52 at 37–38, he does not respond to either substantive defense. At most, the plaintiff cites three subsections of section 3:090 as generally applicable to his constitutional and negligence claims. So the Court agrees with the defendants that the plaintiff has not pointed to facts that make out a separate violation of this regulation. *See McPherson*, 125 F.3d at 995–96. Thus, summary judgment is appropriate because Sours has not demonstrated that a genuine issue of material fact exists on his standalone administrative claim.

## CONCLUSION

It is therefore **ORDERED** that the defendants' motion for summary judgment, R. 51, is **DENIED** with respect to the plaintiff's claims against Nurse Allison for negligence and gross negligence.  Summary judgment is **GRANTED** with respect to all other claims.

This the 28th day of May, 2013.

**Signed By:**

**_Amul R. Thapar_**

**United States District Judge**